## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

SAFETY SOCKET, LLC,

                Plaintiff, Counter-Defendant,        Case Number: 07-CV-15364

v.                                       JUDGE PAUL D. BORMAN
                                         UNITED STATES DISTRICT COURT

ALL STATE FASTENER,

                Defendant, Counter-Plaintiff,
                and Third-Party Plaintiff.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Now before the Court is Defendant All State Fasteners Corporation's ("Defendant")
February 13, 2009 Motion for Summary Judgment.[1] (Dkt. No. 54). On March 13, 2009, Plaintiff
Safety Socket, LLP ("Plaintiff") filed its Response. A hearing on this matter was held on April 15,
2009. For the following reasons, the Court GRANTS IN PART and DENIES IN PART Defendant's
Motion.

## I.      BACKGROUND

This claim arises from Plaintiff's allegation that Defendant made a misrepresentation during
the course of contract negotiations that it had an exclusive relationship with Honeywell
International, Inc. ("Honeywell").

Plaintiff is a Delaware corporation, with its principal place of business in Chicago, Illinois.

---

[1] This is the second time Defendant has filed a Motion for Summary Judgment. (*See* Dkt.
No. 18). The first time the Court ruled Defendant's Motion premature because discovery had
not yet been conducted. (Dkt. No. 30).

(Compl. ¶ 2). Defendant is a Michigan corporation, with its principal place of business located in Warren, Michigan. (*Id.* ¶ 3).

Plaintiff manufactures "high-strength fasteners and other products for use in the machine tool, tool and die, automotive, aircraft, aerospace, and electronics industries." (*Id.* ¶ 6). Defendant distributes and supplies fasteners and other products in the heavy equipment, transportation, and construction industries. (*Id.* ¶ 7).

During early 2005, Honeywell, dissatisfied with its incumbent supplier's cost, quality, delivery performance, and customer service, began a search for a new supplier to produce custom-made, high strength steel shafts ("Shafts") for use in its automobile turbochargers. (Pl.'s Resp. Br. Ex. B, Yang Dep. 22:2-5, 39:15–21; Ex. C, Disser Dep. 33:6–10). On or about May 17, 2005, following a recommendation from Brian Disser, a sales representative working on Defendant's behalf, Honeywell submitted a Request for Quotation ("RFQ") for various Shafts (among other products) to Defendant. (Yang Dep. 34:9–37:10; Disser Dep. 29:22–23).

Defendant then submitted the RFQ for the Honeywell Shaft Project to Plaintiff in late July or early August 2005. (Pl.'s Resp. Br. Ex. E, Lane Dep. 33:23–34:1). Around this same time, or perhaps contemporaneously, Defendant submitted its Terms and Conditions of Purchase to Plaintiff for its review. Attached to Defendant's brief is a purported copy of Plaintiff chairman Jim Erbs' handwritten objections to the original Terms and Conditions of Purchase. (Def.'s Br. Ex. 5). Next to the paragraph entitled "Volume Projections," there is a handwritten arrow pointing toward the paragraph with "No" written above it. (*Id.*) On December 15, 2005, Jim Erbs sent an e-mail to Steve Payne, Plaintiff vice president of sales and marketing, with revisions to Defendant's Terms and Conditions of Purchase attached. The e-mail provides in relevant part:

There are many material changes in this draft, and I have elected not to send it to the attorney's yet until the bulk of these conceptual differences have been hammered out. Accordingly, we retain the right to run the entire document past our attorneys when the key issues have been resolved.

The attached revisions to Defendant's Terms and Conditions of Purchase deleted the "Volume Projections" paragraph. (Def.'s Br. Ex. 6).

On October 28, 2005, Honeywell and Defendant entered into an agreement ("Honeywell Agreement") for the purchase of various Shafts. (Pl.'s Resp. Br., Ex. F). According to Michelle Yang, former Honeywell global commodity manager for hardware, specialty group, the Honeywell Agreement was an "open scheduling agreement," which means that it did not specify any quantity of parts or list any dates on which Honeywell was required to purchase Shafts from Defendant. (Yang Dep. 64:21–66:7, 68:23–69:5). In addition, the Honeywell Agreement contained a reference to a production part approval process ("PPAP") in which the Shafts, following a qualification process, could be approved for purchase. (Yang Dep. 69:8–15, 71:4–9). Defendant did not provide Plaintiff a copy of this agreement until the discovery period in this litigation. (Pl.'s Resp. Br. Ex. I, Erbs Aff. ¶ 4).

According to Plaintiff's Steve Payne, during a November 2005 telephone conversation with Virgil Cummings, Vice Chairman for Defendant, Mr. Cummings told him that Defendant had entered into an agreement with Honeywell under which Defendant would be the sole supplier of the Shafts to Honeywell for a period of three years. (Pl.'s Resp. Br. Ex. J, Payne Aff. ¶ 4). Although Mr. Cummings did not provide a specific time, he did acknowledge that he told a representative of Plaintiff that Defendant had a three year blanket agreement with Honeywell to supply 100 percent of their shaft requirements. (Pl.'s Resp. Br. Ex. D, Cummings Dep. 144:23–145:17, 153:14–154:7).

From December 12, 2005 through March 7, 2006, Defendant issued nineteen individual purchase orders for Shafts (the "Purchase Orders") to Plaintiff. The Purchase Orders appear to require "level 3 PPAP" testing—an industry standard. (Pl.'s Resp. Br. Ex. L, Dec. 12, 2005 Purchase Order). The Purchase Orders do not reference Honeywell's PPAP process. (*Id.*)

At some point after Defendant issued the first Purchase Order to Plaintiff, Honeywell added new requirements to the PPAP approval process between Honeywell and Defendant. (Cummings Dep. 138:21–140:5). These additional requirements included conducting a 1,000 hour durability test on certain Shafts and receiving PPAP approval by Honeywell's end customers. (*Id.* 159:20–160:4). For instance, Defendant received a form from Honeywell dated March 2, 2006 ("Qualification Test Plan"), which required the 1,000 hour durability test for the shaft with part number 44796-0009 ("-9") for certain Honeywell customers. (Pl.'s Resp. Br. Ex. M).

Sometime before March 2006, Defendant's management directed that All State negotiate an agreement with Plaintiff regarding the non-disclosure of confidential information and non-solicitation of Honeywell. (Lane Dep. 118:22–121:24). These negotiations led to a draft version of the Non-Disclosure and Non-Solicitation Agreement ("NDA"), which provided that Defendant would purchase the Shafts exclusively from Plaintiff. (Pl.'s Resp. Br. Ex. N). The NDA, however, was never jointly executed by both parties. (*Id.*) Nevertheless, Defendant considered the NDA valid and in force. (Pl.'s Br. Ex. Q, 11/30/06 Letter ("It is clear, then, that the [NDA] is valid and in force."))

On April 12, 2006, Plaintiff and Defendant entered into an agreement that codified the revised terms and conditions to the Purchase Orders ("Terms and Conditions Agreement"). (Pl.'s Resp. Br. Ex. P). The Terms and Conditions Agreement defines "Agreement" as "[t]his Agreement

on Terms and Conditions of Purchase (including the Orders (as defined below) accepted by

[Plaintiff] . . . )."  The Terms and Conditions Agreement contains several important provisions:

1. Binding Terms.  These terms and conditions ("Terms") shall apply to all purchase orders made by [Defendant] and accepted by [Plaintiff] during the term of the Agreement ("Orders").  These Terms *supersede* (a) the provisions of [Defendant's] purchase orders and standard [Defendant's] terms and conditions, if any, . . . (c) any additional terms on [Defendant's] purchase orders, . . . and (e) any other document provided by [Defendant or Plaintiff] to the other.   Seller shall accept the offer in writing or by beginning work hereunder. Upon acceptance by [Plaintiff], an Order will become a binding agreement between [Defendant] and [Plaintiff] subject to the Agreement.

2. Purchase Orders and Releases.  Each Order placed hereunder shall be a spot-buy Order.  A spot-buy Order is a one-time Order for a specific quantity of Product.

. . .

5. Changes. [Defendant] may from time to time by notice to [Plaintiff] require changes to the drawings, specifications, packaging, testing, quantity, time or method of delivery or shipment, or other requirements prescribed in the Orders. . .

. . .

12.  Volume projections. [Plaintiff] acknowledges that any estimates, forecasts or projections of future anticipated volume or quantity requirements for Products provided by [Defendant] are provided for informational purposes only and, like any other forward looking projections, are based on a number of economic and business factors, variables and assumptions, some or all of which may change over time. Buyer makes no representation, warranty, guaranty or commitment of any kind or nature, express or implied, regarding any such estimates, forecasts or projections provided to [Plaintiff], including with respect to the accuracy of completeness or any such estimates, forecasts or projections.

. . .

33.  Entire Agreement.  The Agreement constitutes the entire agreement between the parties with respect to the its subject matter and *supersedes all prior oral/written representations or agreements* by the parties with respect to the subject matter of the agreement including [Defendant's] request for quotation, [Plaintiff's] quotation, unless specifically incorporated into the agreement.   Except as otherwise provided in the Agreement, no subsequent terms, conditions, understandings or agreements purporting to modify the terms of the Agreement will be binding unless in writing

and signed by both parties. [hereinafter "Merger"].

(*Id*.) (emphasis added).

Around the same time, Plaintiff began struggling to keep on schedule, which included providing updates to Defendant. (Pl.'s Resp. Br. Ex. U, Steve Payne Tr. 82:12–83:2). In fact, internal Plaintiff e-mails not only indicate that Plaintiff acknowledged its failure to stay on schedule but also show that Plaintiff had to borrow and replicate paperwork from another supplier to complete its own deliverables to Defendant. (Def.'s Br. Ex. 14, 8/1/06 Email).

On May 24, 2006, Defendant instructed Plaintiff to put orders on hold. At roughly the same time, Honeywell requested that Defendant begin the process of finding a new supplier for the Shafts. (Yang Dep. 84:1–8, 86:18–21). Per Honeywell's request, in late May 2006, Defendant sent out RFQs for the Shafts to Sundram, a manufacturer based in India. (Giorgio Dep. 154:5–18).

In late August 2006, Plaintiff alleges that because of Defendant's "repeated misrepresentations about timelines and deadlines" the project was a "money-losing enterprise." (Compl. ¶ 38). Plaintiff, therefore, notified Defendant on August 29, 2006 that Plaintiff was putting the project on hold. (*Id*. ¶ 39, Ex. 5, 8/29/06 Email).

On November 17, 2006, Jim Erbs, the Chairman of Safety Socket, sent this letter to Defendant:

> As you know, our agreements with [Defendant] hinged on the fact that [Plaintiff] would be the exclusive supplier of non-fastener shaft-type parts [] to [Defendant] and, by extension, Honeywell []. Throughout our contract negotiations, All State represented that [Defendant] was to be the exclusive supplier of the parts to [Defendant]. Those representations of exclusivity were essential inducements for [Plaintiff] to enter into the agreements with [Defendant].
>
> . . .
>
> . . . . In fact, in our conference call on October 25th it became clear that the

statements by [Defenant] as to [Plaintiff's] exclusivity as the supplier were not true at the time the agreements were made, and are not true today. Needless to say, [Defendant's] representations of exclusivity to [Plaintiff] belied [Defendant's] actual knowledge that ultimate sourcing decisions rested in the hands of Honeywell customers, not [Defendant] or Honeywell.

(*Id*. ¶ 45, Ex. 6, 11/17/06 Letter). Plaintiff then "voided" the contract and requested $325,838 in reimbursement for its losses. (*Id*.)

On November 30, 2006, Defendant responded to Plaintiff's letter with its own, stating that Plaintiff was Defendant's exclusive supplier of the parts in the Purchase Orders, but noted that "Honeywell may have suppliers other than [Defendant] for these critical parts." (Compl. ¶ 46, Ex. 7, 11/30/06 Letter). Defendant also expressed its belief that Plaintiff could not terminate the NDA and it continued to be valid. (*Id*.).

During May, 2007, Plaintiff did supply some parts to Defendant for Honeywell (specifically, the -9 Shafts). (Def.'s Br. Ex. 1, Cummings Decl. ¶ 8). According to Mr. Cummings, though, Plaintiff refused to provide the parts at the pricing contained in the purchase order. Instead, those parts were purchased from Plaintiff under different terms determined after Plaintiff terminated the Purchase Order. (*Id*.) Internal Plaintiff e-mails show that Plaintiff withheld delivery of the parts to Defendant to guarantee payment from Defendant, but it is unclear whether the payments terms were different. (Def.'s Br. Ex. 16, 5/9/07 Email; Ex. 17, 5/10/07 Email; Ex. 18, 5/11/07 Email)

On May 23, 2007, Defendant communicated to Plaintiff that Honeywell refused to enter into a long-term supply agreement. (Compl. ¶ 55).

In a June 26, 2007 conference call with Defendant and Honeywell, Plaintiff learned from Honeywell that Honeywell was not contractually restrained from seeking other vendors to produce the parts, was not aware of any agreements between Plaintiff and Defendant, and had never

committed to an exclusive supply agreement with Defendant. (*Id*. ¶ 57).

On December 17, 2007, Plaintiff filed the instant lawsuit alleging: (1) breach of contract; (2) indemnification; (3) fraud; and (4) silent fraud.

On January 22, 2008, Defendant filed a Third-Party action against Honeywell alleging: (1) breach of contract; (2) indemnification and contribution; (3) misrepresentation; (4) promissory estoppel; and (5) unjust enrichment. (Dkt. No. 8). On May 12, 2008, Defendant voluntarily dismissed its third-party action against Honeywell. On May 23, 2008, pursuant to a stipulation, Defendant filed an Amended Answer and Counter-Claim against Plaintiff alleging breach of contract. (Dkt. No. 22).

On May 1, 2008, Defendant filed a Motion for Summary Judgment as to all of Plaintiff's claims. (Dkt. No. 18). Because discovery had not yet been conducted, the Court found Defendant's Motion ("Original Motion for Summary Judgment") premature and denied it without prejudice. (Dkt. No. 31). After the close of discovery, Defendant filed the instant motion. (Dkt. No. 31).

## II.    ANALYSIS

### A.    Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, "[a] party claiming relief may move, with or without supporting affidavits, for summary judgment on all or part of a the claim." FED. R. CIV. P. 56(a). Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

> Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id*. at 323; *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting BLACK'S LAW DICTIONARY 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Id.*; *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. FED. R. CIV. P. 56(e). The rule requires that non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce

more than a scintilla of evidence to survive summary judgment).

**B.      Breach of Contract Claim and Indemnity Claim**

Defendant seeks summary judgment on Plaintiff's breach of contract claim and indemnity claim, Counts I and II.  Defendant argues that summary judgment is appropriate for these claims because: (1) Plaintiff terminated the Terms and Conditions Agreement and therefore is not entitled to damages against Defendant pursuant the terms of the Terms and Conditions Agreement; and (2) the Terms and Conditions Agreement directly contradicts Plaintiff's allegations in support of Count I and II and parol evidence bars any statements to the contrary.

**1.      Plaintiff's Termination of Agreement**

Defendant first contends that Plaintiff's breach of contract and indemnity claims must fail because pursuant to the Terms and Condictions Agreement Plaintiff is not entitled to damages when it chose to terminate the contract.  The Terms and Conditions Agreement states in relevant part:

> Termination for Convenience of [Plaintiff]: [Plaintiff] may terminate all or any part of an Order or the Agreement, even if the Order or the Agreement is, or is deemed to be, a requirements contract, at any time and for any reason, by notifying [Defendant] in writing at least 120 days prior to the effective date of such termination.  Upon receipt of such notice, [Defendant] may elect to terminate any or all Orders which remain outstanding under this Agreement, at no liability to [Defendant].

(Def. Br. Ex. 3, Agreement ¶ 25) (emphasis added).

Defendant contends that this contract term negates Plaintiff's claim for damages because of the phrase "no liability to [Defendant]."  From the face of the contract, however, this term modifies the beginning of the sentence: Defendant "may elect to terminate any or all Orders which remain outstanding under this Agreement."  Therefore, where Plaintiff terminates the contract for convenience, Defendant may elect to terminate outstanding orders at the time of termination without

facing liability *for those orders*.  Defendant attempts to contort this language to immunize it from Plaintiff's alleged claim of Defendant's non-performance seeking damages from the entire contract, including investment, lost opportunities and the like.  Defendant's argument is not well-taken.

### 2.    Contradiction between Plaintiff's Allegations and Agreement

Plaintiff alleges in its Complaint that Defendant breached the Agreement "by failing and refusing to accept Parts from Safety Socket, as required. [Defendant] also breached the [Terms and Conditions] Agreement in failing to comply with its contractual obligations and implied covenants of good faith and fair dealing."  (Compl. ¶ 62).  Plaintiff further alleges Defendant breached the Non-Disclosure agreement by "making numerous, repeated misrepresentations about the chain of exclusivity linking Safety Socket, All State, and Honeywell, in violation of the [Non-Disclosure Agreement's] implied covenants of good faith and fair dealing.  (*Id*. ¶ 63).

Plaintiff also seeks indemnification from Defendant, relying upon the Terms and Conditions Agreement, which sets forth in pertinent part:

> Buyer Indemnification.  Buyer agrees to indemnify, defend and hold harmless, Seller and Sellers directors, officers, employees, successors and assigns, from and against any and all Losses arising out of relating to or resulting in any way from . . . . any noncompliance by Buyer with its representations, warranties or obligations under the Agreement . . . ."

(Terms and Conditions Agreement ¶ 19(b)).

Defendant argues that these claims for breach of contract and indemnity must fail because Plaintiff's allegations are contradicted by the Terms and Conditions Agreement.  To this end, Defendant points to the Terms and Condition Agreement, which states that Defendant does not make any volume guarantees, can make changes as to testing, and that the contract was a "one-time Order for specific quantity of product."  (Terms and Condition Agreement ¶¶ 2, 5, 12).

11

Plaintiff's Response Brief provides three sources of breaches of the contractual relationship between the parties.

First, Plaintiff asserts that All State breached the NDA's exclusivity provision by soliciting an India-based supplier for quotes on the Shafts in May 2006. The relevant provision in the NDA provides as follows: "All State agrees that . . . it will purchase all of the Parts exclusively from [Safety Socket]." But, All State's mere solicitation of quotations from another supplier, without more, does not constitute a breach of the NDA.

Plaintiff next contends that Defendant and Honeywell imposed product qualification requirements different in kind than the "level 3 PPAP" test agreed upon by the parties. Under paragraph five of the Terms and Conditions Agreement, it provides that "[Defendant] may from time to time *by notice to the [Plaintiff]* require changes to the . . . testing . . . prescribed in the [Purchase] Orders." (*Id*. ¶ 5)(emphasis added). According to Plaintiff's Erbs, Defendant first conveyed the requirements imposed by Honeywell's customers in June 2006. (Pl.'s Resp. Br. Ex. I, Erbs Decl. ¶ 5) (emphasis added). Defendant's Cummings, however, testified that Defendant informed Plaintiff of the additional requirement within twenty-four hours of being informed of the test. (Cummings Dep. 132:13–21). The Qualification Test Plan was dated March 2, 2006. While neither Defendant's Cummings nor Nick Giorgio, executive vice president for Defendant, could confirm when Defendant first received the Qualification Test Plan, Mr. Giorgio did confirm that there was at least some delay in passing along the information to Plaintiff because Defendant was waiting to learn Honeywell's intentions regarding the durability test. (Giorgio Dep. 96:18–97:5).

The Court finds that genuine issues of material fact persist as to whether Defendants delay—however long it may have been—in informing Plaintiff of the new requirements (even

though the 1,000 hour testing was conducted in China by Honeywell) was a breach of the Terms and Conditions Agreement and Purchase Orders.

Finally, Plaintiff submits that Defendant breached the indemnity provision by not indemnifying Plaintiff for any losses arising out of Defendant's non-compliance with the Terms and Conditions Agreement. Because genuine issue of material fact remain as to whether Defendant failed to comply with the Terms and Conditions Agreement, Plaintiff's indemnity claim cannot be summarily dismissed.

Accordingly, the Court finds that genuine issues of material fact exist as to Plaintiff's breach of contract and indemnity claims and therefore denies Defendant's Motion for Summary Judgment as to those claims.

### C.     Fraud in the Inducement & Silent Fraud

Plaintiff alleges in the Complaint that Defendant committed fraud in the inducement by making misrepresentations to Plaintiff regarding its exclusive relationship with Honeywell. (Compl. ¶¶ 69-74). Plaintiff also alleges Defendant committed silent fraud by failing to disclose the fact it did not have an exclusive relationship with Honeywell. (*Id.* ¶¶ 75-78).

In Michigan, the elements of fraud are:

(1) That defendant made a material misrepresentation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury.

*Hi-Way Motor Co. v. International Harvester*, *Co*., 398 Mich. 330 (1997). Silent fraud exists when there has been a suppression of material facts and a duty to disclose those facts. *M&D, Inc. v. W.B. McConkey*, 213 Mich. App. 22, 35-35 (1998). Suppression of facts and truths can constitute silent

fraud where the circumstances are such that there exits a legal or equitable duty to disclose.  *Hord v. Envir. Research Inst*., 463 Mich. 399, 412 (2000).  "[A] legal duty to make a disclosure will arise most commonly in a situation where inquiries are made by the plaintiff, to which the defendant makes incomplete replies that are truthful in themselves but omit material information." *Id*.  In addition, a duty to disclose may arise where a party receives new or different information that renders  prior disclosures or representations untrue or misleading.  *Cloverdale Equipment Co v. Simon Aerials, Inc.*, 869 F.2d 934, 941 (6th Cir. 1989).

In support of its silent fraud claim, Plaintiff alleges (1) that Defendant knew that "(a) Honeywell's end use customers had to approve the substitution of [Plaintiff], or the [Shafts], in place of existing Honeywell suppliers, and (b) Honeywell could purchase the [Shafts] from suppliers other than [Defendant]," (2) that Defendant had a duty to disclose these facts to Plaintiff, (3) that Defendant did not disclose them to Plaintiff in order to induce Plaintiff to enter into a contractual relationship with Defendant, and (4) that it suffered damages as a result.

Instead of arguing that it did not have a legal or equitable duty to disclose the facts listed above to Plaintiff or that at least one of the facts were subsumed within Plaintiff's fraud in the inducement claim, Defendant contends that the economic loss doctrine bars Plaintiff from asserting his silent fraud claim because it arises from Plaintiff's contractual relationship with Defendant.

The economic loss doctrine arose as a means of separating actions arising in tort from those arising in contract.  Simply stated, the economic loss doctrine provides that where a plaintiff's damages are purely economic in nature, the plaintiff cannot maintain a tort claim based on breach of contract facts.  *Neibarger v. Universal Coops., Inc.*, 439 Mich. 512, 520 (1992).  Michigan courts, however, recognize an exception to the economic loss doctrine for fraud in the inducement.

14

*See, e.g., Huron Tool & Eng'g Co v. Precision Consulting Servs., Inc.*, 209 Mich. App. 365, 368 (1995).

In an attempt to avoid the economic loss doctrine, Plaintiff asserts that its fraud claims are based on Defendant's pre-contractual misrepresentations and its failure to disclose that, *inter alia*, Honeywell could purchase shafts from suppliers other than Defendant and that Defendant did not have a three-year supply agreement with Honeywell. The Court need not determine, however, whether the economic loss doctrine bars Plaintiff's silent fraud claim because that claim is merely a slightly altered version of Plaintiff's fraud in the inducement claim, which, as set forth below, should be dismissed.

Pursuant to Michigan law, fraud in the inducement occurs where a party materially misrepresents future conduct under circumstances in which the assertions may be reasonably expected to be relied upon and are relied upon. *Begola v. Wild Bros.*, 210 Mich. App. 636, 639 (1995). Fraud in the inducement to enter a contract renders the contract voidable at the option of the defrauded party. *Id*. at 640.

Defendant asks this Court to summarily dismiss Plaintiff's fraud in the inducement claims because the Terms and Conditions Agreement not only contained a merger clause but also other provisions, which otherwise contradict and diminish any alleged representation as to exclusivity between itself and Honeywell. As a result, Defendant argues, Plaintiff should be barred from presenting parol evidence on this issue.

In *UAW-GM Human Res. Ctr. v. KSL Recreation Corp.*, the Michigan Court of Appeals summarized the parol evidence rule as follows: "parol evidence of contract negotiations, or of prior or contemporaneous agreements that contradict or vary the written contract, is not admissible to vary

the terms of a contract which is clear and unambiguous." 228 Mich. App. 486, 492 (1998) (internal

citation omitted). The Michigan Court of Appeals further explained:

> when the parties include an integration clause in their written contract, it is
> conclusive and parol evidence is not admissible to show that the agreement is not
> integrated except in cases of fraud that invalidate the integration clause or where an
> agreement is obviously incomplete "on its face" and therefore, parol evidence is
> necessary for the "filling of gaps."
>
> . . . .
>
> In other words, while parol evidence is generally admissible to prove fraud, fraud
> that relates solely to an oral agreement that was nullified by a valid merger clause
> would have no effect on the validity of the contract. Thus, when a contract contains
> a valid merger clause, the only fraud that could vitiate the contract is fraud that
> would invalidate the merger clause itself, i.e. fraud relating to the merger clause or
> fraud that invalidates the entire contract including the merger clause.

*Id*. at 502 (internal citation omitted).

The Sixth Circuit recently examined this issue and explained:

The key question regarding contracts that contain a merger clause is whether one
party justifiably relied on the representations of the other where the written
agreement not only failed to include those representations, but clearly stated that by
signing the contract the parties were agreeing that the written document made up
their entire agreement. Moreover,

> [t]here is an important distinction between (a) representations of fact
> made by one party to another to induce that party to enter into a
> contract, and (b) collateral agreements or understandings between
> two parties that are not expressed in a written contract. It is only the
> latter that are eviscerated by a merger clause, even if such were the
> product of misrepresentation. It stretches the [*UAW*] ruling too far to
> say that any pre-contractual factual misrepresentations made by a
> party to a contract are wiped away by simply including a merger
> clause in the final contract.

*LIAC, Inc. v. Founders Ins. Co.*, 222 Fed. Appx. 488, 493 (6th Cir. 2007) (unpublished) (internal

citations omitted).

In *LIAC*, the plaintiff argued that the defendant company, Founders Insurance Co. ("Founders"), had misled their executives by purporting that they could handle the volume of business in a timely fashion and that they were familiar with Michigan's no-fault insurance law. *Id.* at 493-94. The Sixth Circuit noted that LIAC's argument lacked discussion regarding how the defendant's misrepresentations constituted fraud as to the merger clause or the contract as a whole. *Id.* at 494. The Sixth Circuit held that because there was no record that the plaintiff had "ever questioned the presence or purpose of the merger clause," and LIAC admitted signing the agreement, there was no basis for finding the defendant "fraudulently induced [the plaintiff's] acceptance of the merger clause." *Id.*

The Sixth Circuit then examined whether LIAC has created a genuine issue of material fact as to fraud as to the contract on a whole. LIAC argued that "Founders induced LIAC to enter an agreement that was materially different from the contract it expected, based on Founders's alleged misrepresentations." *Id.* The Sixth Circuit held that this argument could be construed as relating to the entire contract. But, because LIAC's arguments only "go to the quality and extent of Founder's performance, not to the absence of such performance" the record did not support this interpretation. *Id.*

In the instant case, Plaintiff does not argue that Defendant's alleged misrepresentations invalidate the Merger clause itself. Further, Plaintiff does not contend that it was unaware of the Merger clause, nor does Plaintiff argue that it did not sign the Terms and Conditions Agreement, which included this clause. Therefore, as in *LIAC*, Plaintiff's claim of fraud in the inducement does not qualify as a claim of fraud which would vitiate the Merger provision itself.

This leads the Court to examine the issue of whether Plaintiff's allegation that Defendant's

misrepresentation that it had an exclusive relationship with Honeywell qualifies as a claim of fraud that would invalidate the *entire contract*. As stated previously, representations of fact made by one party to another during pre-contractual negotiations to induce that party to enter into a contract may invalidate the entire contract even if that contract contains a merger clause. It is only the collateral agreements or understandings between the parties that may be "eviscerated by a merger clause, even if such were the product of misrepresentation." *Star Inc. Co. v. United Commercial Ins. Agency, Inc.*, 392 F. Supp. 2d 927, 928–29 (E.D. Mich. 2005).

Plaintiff alleges that but for Defendant's alleged misrepresentation that it was an exclusive supplier for Honeywell for the Shafts, Plaintiff would not have contracted with Defendant. Defendant, on the other hand, argues that the alleged representation was nullified by the Merger clause and was further contradicted by other provisions of the Terms and Conditions Agreement.

Plaintiff argues this case is similar to *Diamond Computer Sys., Inc. v. SBC Comm.*, 424 F. Supp. 2d 970 (E.D. Mich. 2006), in which a district court found summary judgment inappropriate where a plaintiff maintained that "it would not have entered in to these agreements but for the misrepresentations concerning exclusivity and quick and easy connectivity, the plaintiff alleges fraud that would invalidate the entire contracts, including the merger clauses."[2] *Id*. at 986. Plaintiff argues that because it would not have contracted with Defendant but for the misrepresentations regarding the Honeywell relationship, the fraud would invalidate the entire contract.

---

[2] Plaintiff also relies upon *Shah v. Racetrac Petroleum Co*., 338 F.3d 557 (6th Cir. 2003) for the proposition that courts have found genuine issues of material fact exist where a defendant makes misrepresentations to induce the plaintiff to contract and the contract contains a merger clause. However, this authority is not applicable to the instant case as it deals with Tennessee law, rather than Michigan law.

Defendant argues that unlike in *Diamond Computer*, where there were no provisions in the agreement that were in conflict with the alleged representations, Plaintiff's allegations are contradicted by provisions in the Terms and Conditions Agreement. In its Reply to its original Motion for Summary Judgment, Defendant relied upon *Doty v. Cleannet of Greater Michigan, Inc.*, No. 238717, 2003 Mich. App. LEXIS 3251 (Mich. Ct. App. Dec. 16, 2003) (unpublished), in which the Michigan Court of Appeals found that a plaintiff's reliance on pre-contractual representations was unreasonable when there was a merger clause and "the alleged misrepresentations were explained, contradicted or superseded by the written terms of the franchise agreements and the merger and integration clause nullified any promises or representations made outside the agreements themselves." *Id*. at *11. Defendant contends that the instant case is indistinguishable from *Doty* because the Terms and Conditions Agreement states that each purchase order is a "spot-buy [o]rder" and that no volume projection is guaranteed. Further, Defendant notes that pursuant to the NDA, Plaintiff had to agree not to solicit business from the "Customer" for the period of time in which it supplied parts to Defendant. Defendant contends that the presence of the NDA is evidence of the fact that Defendant was worried about Plaintiff supplying its parts directly to Honeywell and therefore shows that Defendant did not have an exclusive relationship with Honeywell.

After review, the Court finds that no genuine issues of material fact exist as to whether Plaintiff was fraudulently induced into entering a contract with Defendant, because Plaintiff's claims are contradicted through the various provisions of the Terms and Conditions Agreement.

In *Doty*, the Michigan Court of Appeals found that each alleged misrepresentation was addressed by a specific clause which superceded the prior representation. *Doty*, 2003 Mich. App. LEXIS 3251 *11-12. In the instant action, Plaintiff argues that because the Terms and Conditions

Agreement does not mention Honeywell or exclusivity, a genuine issue of material fact exists as to whether the representations truly conflict with any of the provisions of the Terms and Conditions Agreement. Specifically, Plaintiff argues that the Volume Projection provision addressed only quantity, not exclusivity. The Court does not agree. The Court finds that the instant case is sufficiently similar to *Doty*, where the exact misrepresentations (i.e. value and size of cleaning accounts, insurance, ownership of the business, designated territories, the term of the agreement, the termination, etc.) were addressed in the contract. *Id*. While there is no term specifically addressing Defendant's relationship with Honeywell or even any mention of Honeywell for that matter, the Binding Terms, Volume Projection, and Merger clauses work together to eliminate any reasonable reliance on the alleged misrepresentations.

Here, the Volume Projection provision provides that:

> [Plaintiff] acknowledges any estimates, forecasts or projections of future anticipated volume or quantity requirements for Products provided by [Defendant] are provided for informational purposes only and . . . are based on a number of economic and business factors, variables and assumptions, some or all of which may change over time. Buyer makes no representation, warranty, guaranty or commitment of any kind or nature, express or implied, regarding any such estimates, forecasts or projections provided to [Plaintiff], including with respect to the accuracy of completeness or any such estimates, forecasts or projections.

(Def.'s Br. Ex. 13). The parties contractual relationship called for Plaintiff to supply parts to Defendant, which in turn would supply parts to Honeywell. While representations regarding exclusivity and past dealings with Honeywell certainly bolster the stability of the parties contractual relationship, those representations ultimately involve the quantity of parts supplied by Plaintiff to Defendant. In fact, the Complaint seems to acknowledge such a conclusion. There, Plaintiff alleges that Defendant made repeated representations to Plaintiff that "(a) [Defendant] had an exclusive

agreement with Honeywell to supply the Parts; and (b) [Defendant] would purchase all of the Parts required by Honeywell from [Plaintiff]." (Compl. ¶ 69). In this paragraph, Plaintiff is likening Defendant's relationship with Honeywell to a requirements contract, which is generally a question of quantity. Thus, while exclusivity does not equal quantity, quantity concerns dominate the exclusivity question.

Plaintiff also argues (1) that the Volume Projection provision addresses *future* anticipated volume and limits Defendant's liability only for such *future* estimates, (2) that the alleged fraudulent conduct predated the issuance of all nineteen Purchase Orders and the Terms and Conditions, and (3) that the Purchase Orders were not estimates of future anticipated volume. Plaintiff's argument is without merit. First, while the Volume Projection provision pertains to estimates, forecasts, and projections of Defendant's quantity requirements, it does not necessarily mean that it applies only to projections or estimates made in the future—that is, after the Terms and Conditions Agreement was signed. Per the Merger and Binding Terms clauses, the Terms and Conditions Agreement supersedes all prior or written representations or agreements. Therefore, the Volume Projection provision covers any past alleged representations as to quantity requirements.

Second, contrary to Plaintiff's assertion, the Purchase Orders were estimates of future anticipated volume. According to the Purchase Order attached to Plaintiff's own brief, the Purchase Order was a "BLANKET ORDER FOR APPROX[IMATELY] 230,000 EAU." In addition to being *conditioned on* PPAP approval and Plaintiff being ISO 9000 - QS900 approved, the Purchase Order clearly states that "TERMS AND CONDITIONS ON REVERSE OR ATTACHED TO THIS PURCHASE ORDER ARE AN INTEGRAL PART OF THIS ORDER." Therefore, if Plaintiff accepted the Purchase Order and the original Terms and Conditions of Purchase were attached to

the Purchase Order, as the facts indicate, then those terms control until the Terms and Conditions Agreement was signed, thereby superseding the Terms and Conditions of Purchase.

In addition to contradicting the provisions of the Terms and Condition Agreement, the representations regarding exclusivity also conflict with the express terms of the NDA. As Defendant noted, the NDA prohibited Plaintiff from selling directly to Honeywell. Therefore, if Honeywell had an exclusive relationship with Defendant, then the provision for the non-solicitation of Honeywell by Plaintiff would be unnecessary.

Plaintiff, which was represented by sophisticated business people throughout this transaction, cannot now complain that Defendant fraudulently induced Plaintiff to enter into an agreement with Defendant thereby voiding the entire agreement when the agreement contained provisions that directly and indirectly contradict the alleged misrepresentations made by Defendant. If Plaintiff wanted to rely on any representation regarding exclusivity, then it should have addressed its concerns before signing an agreement, which contained a broad merger clause and a clause disclaiming any and all volume projections. Instead, Plaintiff freely accepted the Terms and Condition Agreement without any changes to the Binding Terms, Change, Volume Projection, or Merger provisions. In fact, the evidence shows that Plaintiff recognized the risk in signing an agreement that contained such provisions and even went so far as to make notations next to the Volume Projection provision, indicating that it was unsatisfactory. Nevertheless, Plaintiff executed the Terms and Conditions Agreement with the Binding Terms, Change, Volume Projection, and Merger provisions untouched.

Accordingly, the Court grants Defendant summary judgment as to Plaintiff's fraud claims.

**D.     Limitation of Damages**

Defendant also requests that the Court dismiss Plaintiff's claim to lost profits and lost opportunities. At the hearing, the Court declined to address Defendant's request. According to an exhibit attached to Plaintiff's Response, the parties have agreed to postpone discovery on damages until the Court's resolution of the instant Motion. (Pl.'s Resp. Br. Ex. AA, 11/17/08 Email). Because Counts I and II of Plaintiff's cause of action survived Defendant's Motion, the parties may now conduct discovery on damages as to those claims. Of course, any claims to damages by Plaintiff is tempered by the Terms and Conditions Agreement, which explicitly disclaims lost profits and related damages. (Terms and Conditions Agreement ¶ 19(c)).

## III.    CONCLUSION

For the reasons stated, the Court:

(1)    DENIES Defendant's Motion for Summary Judgment as to Plaintiff's claims for breach of contract and indemnification (Count I and II); and

(2)    GRANTS Defendant's Motion for Summary Judgment as to Plaintiff's fraud and silent fraud claims (Counts III and IV).

**SO ORDERED**.

S/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  May 29, 2009

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on May 29, 2009.


S/Denise Goodine                                    
Case Manager